# PURCHASING AGREEMENT

This Purchasing Agreement (the "Agreement") dated as of the 21st day of November, 2018, and among the undersigned, RWDY, Inc., a Texas corporation (hereinafter called "Client") and **Seacoast Business Funding, a division of Seacoast National Bank** (hereinafter called "Purchaser"). Client and Purchaser agree as follows:

1.     PURPOSE OF AGREEMENT.

Client desires to obtain financing by selling and assigning Accounts to Purchaser at a discount below face value on the terms and conditions set forth in this Agreement.

2.     DEFINITIONS.

**"Account"** means all of Client's now existing or hereafter arising (i) accounts as defined under the UCC.

**"Advances"** means all funds remitted by Purchaser to or for the benefit of Client in connection with the sale and assignment of Client's Accounts to Purchaser.

**"Base Index"** means LIBOR. The Base Index may not be Purchaser's lowest or best interest rate, and will be calculated on the greater LIBOR or 2.0%. The interest rate in effect for each calendar month shall be adjusted (if necessary) on the first day of such calendar month and shall be equal to the interest rate in effect as of the close of business on the last business day of the immediately preceding calendar month.

**"Base Index Fee"** shall be as set forth in **Item 1** on the Schedule.

**"Customer"** means each entity to whom Client sells goods or services and as defined under the UCC as account debtor.

**"Collateral"** means all of Client's now owned and hereafter acquired Accounts, Chattel Paper, Deposit Accounts, Goods, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Letters of Credit, Commercial Tort Claims, General Intangibles, Supporting Obligations, the Reserve, all books, records, reports, memoranda, and/or data compilations, in any form (including, without limitation, corporate and other business records, customer lists, credit files, computer programs, printouts and any other computer materials and records) pertaining to any of the foregoing and all proceeds of the foregoing, in all of which Purchaser has been granted a security interest which secures payment and performance of the Obligations of Client to Purchaser.

**"Default"** has the meaning given to such term in **Section 12**.

**"Dispute"** means any kind of claim against Client by a Customer, valid or invalid, that reduces or potentially reduces the amount collectability of an Account due from a Customer.

**"Domestic Account"** means any Account owed by a Customer that is organized under the laws of the United States of America or any state thereof or maintains its chief executive office in the United States.

**"Eligible Foreign Account"** means any Account owed by a Customer that is not organized under the laws of the United States of America or any state thereof and does not maintain its chief executive office in the United States, provided that each of the following conditions are satisfied: (i) the Customer is organized under, or

Initials 𝓑𝓣𝓤

1

maintains its chief executive office in, a country that is a member of The Organisation for Economic Co-operation and Development (OECD); (ii) Purchaser has obtained credit insurance on such Account from an insurer and in amounts that are acceptable to Purchaser; (iii) the Accounts are payable in U.S. Dollars to a lockbox in the United States designated by Purchaser; (iv) Client reports such Accounts separately on the Schedule of Accounts that Client submits to Purchaser; and (v) Client complies with all other requirements reasonably requested, from time to time, by Purchaser with respect to such Account.

**"Exposed Payment"** means any payments received by Purchaser in respect to accounts arising from Goods sold or services rendered by the Client to a Customer whereby Purchaser has notice or any form of information that suggests that the Customer may become subject to a bankruptcy or other form of debtor relief proceeding, to the extent that such payments are likely to have cleared the Customer's deposit account within ninety (90) days of the commencement of said bankruptcy case or are otherwise subject to avoidance.

**"Insider"** means (i) a director of the Client; (ii) an officer of the Client; (iii) a person in direct or indirect control of the Client, including each shareholder or member and a party who holds any form of warrant or option in respect thereto; (iv) a partnership in which the Client is a general partner; or (v) a relative of a director, officer, or person in control of the Client.

**"Ledger Debt"** means any form of indebtedness for goods sold or services rendered purchased by any entity whose Accounts are purchased by Purchase.

**"LIBOR"** means, at any time, a per annum interest rate equal to the per annum interest rate (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1%) as published in the "Money Rates" section of <u>The Wall Street Journal</u> (or another national publication selected by Purchaser) as the one month London Interbank Offered Rate for United States dollar deposits or such other language (or, if such page shall cease to be publicly available or, if the information/description contained on such page, in Purchaser's sole judgment, shall cease to accurately reflect such London Interbank Offered Rate, then such rate as reported by any publicly available recognized source of similar market data selected by Purchaser that, in Purchaser's reasonable judgment, accurately reflects such London Interbank Offered Rate).

**"Obligations"** means all present and future obligations and reasonably anticipated claims that may become owing by Client to Purchaser of every kind and nature, direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, regardless of how they arise, or whether evidenced by any instrument or agreement, whether arising before, during or after the commencement of any federal Bankruptcy Case in which Client is a debtor, including but not limited to, Ledger Debt, fees and expenses, and obligations arising under other agreements.

**"Reserve"** has the meaning given to such term in Section 3.3 below.

**"Reserve Shortfall"** means, at any relevant time, an amount by which the Reserve is less than the required Reserve amount.

**"Schedule"** means the Schedule to Purchasing Agreement attached hereto and incorporated herein. **"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Florida. All terms used in this Agreement which are defined in the UCC but not defined herein have the meanings assigned in the UCC. Additional terms are defined in other parts of this Agreement.

3.    PURCHASE: GENERAL TERMS.

3.1.    Purchases of Accounts.  Client will offer for sale, transfer and assignment to Purchaser its Accounts as further provided in **Item 2** of the Schedule, and said Accounts shall be identified by

Initials _B U_

2

written assignments on a form provided to Client by Purchaser ("Schedule of Accounts"). Purchaser is not obligated to purchase any Account unless the Account is first approved by Purchaser. Client will offer and Purchaser may buy Accounts from Client at a discount as set forth in **Item 3** of the Schedule ("**Purchasing Fee**") from the face value of each Account. The Purchasing Fee will be calculated from the date of purchase by Purchaser allowing for the collection days set forth in **Item 4** on the Schedule. All Accounts purchased by Purchaser and all payments on the Accounts will be the sole property of Purchaser.

3.2. Advances. Purchaser may, and subject to such limits as Purchaser may establish in its sole discretion and as payment towards the Purchasing Fee, fund to Client up to the percentage set forth in **Item 5** on the Schedule of the gross invoice amount of each Account. The total amounts of Advances outstanding are never intended to exceed the Maximum Advances Outstanding set forth in **Item 6** on the Schedule. Notwithstanding, Purchaser may, in its sole discretion, purchase additional Accounts from or advance additional sums to Client. To be eligible for Advances, invoices shall be supported by adequate proof of the fact of Goods sold and satisfactory delivery or in connection with services performed, completion of all work. Purchaser will purchase Accounts on a full dominion, full notification basis, and the Accounts will be handled through a bank lockbox account or post office box controlled by Purchaser. Maximum selling terms shall not exceed the limit set forth in **Item 7** on the Schedule. All Instruments received from Customers evidencing payments will be applied by Purchaser in payment of Obligations on the final Collection Day set forth in **Item 4** on the Schedule after they have been deposited into Purchaser's bank account, provided that such Instruments are actually collected by Purchaser's bank and credited to Purchaser's account. All collections on behalf of and all credits due Client may be applied to any of the Obligations in any manner Purchaser chooses. All Advances and Obligations are due on demand.

3.3. Reserve. Purchaser may create a reserve equal to, and which shall at no time be less than, the Reserve Percentage, as provided in **Item 8** of the Schedule, multiplied by all Accounts purchased ("**Reserve**"), plus the aggregate amount of all Accounts that fail to satisfy the requirements of **Item 9** of the Schedule (i.e., "Advance Limitations") multiplied by the Advance Percentage, as provided in **Item 5** of the Schedule ("**Required Reserve**"). The Reserve will be deducted by Purchaser from each Account at the time of purchase. Said Reserve may be maintained by Purchaser and applied by Purchaser against charge-backs or any Obligations of Client to Purchaser. In Purchaser's sole discretion and assuming no Default exists, Reserve releases will be made available by Purchaser to Client each business day. Reserve releases are made only on Accounts that are paid by Customers or Accounts that are charged back, repurchased or otherwise settled by Client in full. The Reserve will not be due or payable to Client until any and all actual or potential Obligations owing by Client to Purchaser or any reasonably anticipated claims are fully paid and satisfied and Purchaser authorizes, in writing, the filing of a UCC-3 termination statement. Client grants to Purchaser a security interest in the Reserve to secure all Obligations. Purchaser retains the right, in its sole and absolute discretion, and in respect of which Purchaser shall have no liability, to revise said Reserve from time to time if in Purchaser's judgment it is necessary to protect Purchaser with regard to any Obligations owing by Client to Purchaser, or to protect Purchaser against possible returns, claims or defenses of Client's Customers or any other contingencies. If a Default has occurred and is continuing, or, in the event Client shall cease selling Accounts to Purchaser for a period of at least thirty (30) days, Purchaser shall not pay the amount in the Reserve to Client until all Accounts have been collected or Purchaser has determined, in its sole discretion, that it will make no further efforts to collect any Accounts and all Obligations due Purchaser hereunder have been paid and Purchaser authorizes, in writing, the filing of a UCC-3 termination statement.

Initials _BTU_

3

3.4.     Fees. All fees are fully earned and non-refundable on the date incurred, may be charged to the Reserve, but will remain due and payable by Client at all times and will be calculated at the rates set forth in **Item 3** on the Schedule.

    3.4.1.   Base Index Fee. Client will pay Purchaser a fee based on the daily balance of outstanding Obligations multiplied by the Base Index Fee set forth in **Item 1** of the Schedule. The fee will be computed on the basis of actual days elapsed and a 360-day year, calculated monthly and charged to the Reserve on the last day of each month.

    3.4.2.   Minimum Purchasing Fees. Client will sell to Purchaser for the period specified on **Item 10** of the Schedule, a minimum amount of Accounts as set forth in **Item 11** of the Schedule. If Client fails to sell to Purchaser the required minimum amount of Accounts, Client will pay Purchaser an amount equal to the minimum amount of Accounts, less the gross face amount of Accounts sold to Purchaser for such minimum amount of Accounts period, multiplied by the Purchasing Fee, assuming a 60- day collection period. The fee will be calculated for each period specified on **Item 12** of the Schedule and charged to the Reserve on the last day of each such period.

    3.4.3.   Misdirected Payment Fee. Whenever any payment on any Account comes into Client's possession, Client shall hold such payment in trust and safekeeping, as the property of Purchaser, and immediately, and in no event greater than two (2) business days, turn such payment over to Purchaser in the same form as it was received by Client. Client shall pay a misdirected payment fee equal to fifteen percent (15%) of the amount of any payment (but in no event less than $1,000.00) of an Account purchased (and, after the occurrence of an Event of Default, the payment of any Account) which has been received by Client and not delivered in kind to Purchaser within two (2) business days, or, if payment was made electronically, within two (2) business days of the date final payment is made. The misdirected payment fee shall equal thirty percent (30%) of the amount of any such payment received that, in whole or in part, was due to any action taken by Client causing such payment to be made to Client. Further, Client shall segregate and hold in trust and safekeeping, as the property of Purchaser, and immediately turn over to Purchaser, any goods or inventory returned to, reclaimed or repossessed by the Client which are covered by an Account purchased by Purchaser.

    3.4.4.   Missing Notation Fee. Client will pay Purchaser the greater of (i) $1,000; or (ii) 15% of any invoice payment which has been billed to a Customer or received by Purchaser, but which does not have the proper Assignment to Purchaser as specified in **Item 11** of the Schedule.

    3.4.5.   Extended Term Fee. Client will pay Purchaser 2% of any invoice in respect to which the payment terms have been extended by Client in violation of Section 6(e).

    3.4.6.   Default Pricing Fee equivalent to 24% of the outstanding Obligations, divided by 360 days (.0666667% per diem) shall be applicable to all outstanding Obligations when an Event of Default has occurred under the terms of this Agreement

    3.4.7.   Expected Annual Purchase Volume. Fees in this Agreement have been established based on an expected annual purchase volume provided by Client. Accordingly, if Client within the first six (6) months of the term of this Agreement fails to sell to Purchaser an amount equal to at least forty percent (40%) of expected annual purchases, as set forth in **Item 13** of the Schedule, then Purchaser shall have the right to increase the Purchasing Fee by twenty-five percent (25%). The increase will remain in effect for the balance of the term of this Agreement, including any renewal periods.

    3.4.8.   Required Reserve Shortfall Fee. Client will pay Purchaser a daily fee of one percent (1%) of the Required Reserve Shortfall for each business day that a Required Reserve Short Fall exists.

Initials _BTO_

4

3.4.9.   Breach of Representation Fee.  Client will pay Purchaser one percent (1%) of any invoice that is sold to Purchaser and in respect to which client commits any breach of the representations outlined in Section 6(e), 6(f) and 6(q) of this Agreement.  Neither Purchaser's rights to this fee nor the imposition of this fee shall neither excuse the breach nor preclude Purchaser from enforcing any rights under this Agreement.

3.4.10.  Advance Limitation Fee.  Client will pay Purchaser a fee of one percent (1%) of each invoice that fails to satisfy the requirements of **Item 3** of the Schedule (i.e., "Advance Limitations") but that Purchaser nonetheless makes eligible for Advances pursuant to Section 3.2 of this Agreement.

3.4.11.  Delinquent Tax Liability Fee.  The Base Index Fee will be increased by two percent (2%) if the IRS reports a delinquent quarterly tax liability of any kind until such time the tax delinquency is resolved or satisfied.

3.4.12.  Other Fees. Client shall pay such other fees as are set forth in **Item 14** on the Schedule.

3.5      Repurchase of Accounts.  Client will repurchase from Purchaser (i) any Accounts not paid by the Repurchase Date set forth on **Item 10** of the Schedule, and (ii) any Account that Purchaser requests that Client repurchase. At Purchaser's option, Client will repurchase such Accounts at 100% of the gross invoice amounts in one or more of the following ways: (1) by submitting new Accounts, (2) by deducting the amount from any Reserve release due Client, or (3) by payment from Client. All short payments, discounts and any other Obligations Client may have to Purchaser may, at Purchaser's election, be handled in the same manner. Purchaser's security interest in each repurchased Account will remain attached and perfected to secure all of Client's Obligations.

3.6      Purchaser may deduct from the Reserve account all travel expenses, legal fees, filing fees, postage, long distance telephone charges, bank charges and over advance fees, wire transfer and ACH fees and charges, and any amounts chargeable to Purchaser for returned Instruments, field examinations, credit reports, overnight mail delivery, and UCC, tax lien and other searches.

3.7      Automatic Clearing House ("ACH") Authorization:  In order to satisfy any of the Obligations or correct errors, Purchaser is hereby authorized by Client to initiate electronic debit or credit entries through the ACH system to Client's account or any other deposit account maintained by Client wherever located.

3.8      Required Forms.  When Client offers a Schedule of Accounts to Purchaser for sale, as to each Account Client must include a copy of the related invoice as well as a copy of each bill of lading, shipping document and proof of delivery, and contract, purchase order, and/or a purchase order number which corresponds with said invoice(s), as appropriate to the business of Client. Each Schedule of Accounts will be in an aggregate amount of not less than the amounts set forth in **Item 11** of the Schedule, and no invoice listed on a Schedule of Accounts may be dated more than 10 days past its original date of issue.

3.9      Notification.  Purchaser may notify any Customer that Purchaser has been sold, assigned and/or purchased the Customer's Accounts and that the Customer must make payments directly to and only to Purchaser. Client will promptly and in writing notify each Customer that it has sold and/or assigned each Account to Purchaser and will at such time direct each Customer to make all payments on Accounts directly and solely to Purchaser.

Initials _BTO_

5

4.  TERMINATION.

    4.1   This Agreement shall continue in effect from the date of this Agreement through the end of the Term of the Agreement specified in **Item 20** of the Schedule and will automatically renew for successive 12 month periods (each such date being the "**Termination Date**") unless terminated as follows: (a) Purchaser may terminate the Agreement at any time by giving Client 60 days prior written notice, or with no notice upon the occurrence of any Default; or (b) Client may terminate this Agreement on the Termination Date by giving Purchaser at least 60 days but no more than 90 days prior written notice, by certified mail. Upon the occurrence of any Default by Client, Purchaser may terminate this Agreement immediately, without notice, and upon such termination due to any Default, Client shall immediately pay to Purchaser the average monthly revenue (interest and fees) earned by the Purchaser since the date of this Agreement multiplied by the number of months remaining (and pro-rated for partial months) from the date of termination through the next Termination Date (as applicable).

    4.2   Upon termination, all Obligations shall become immediately due and payable without notice or demand. No termination of this Agreement will affect the Obligations of Client, the rights of Purchaser or the security interest in existing or future Collateral until (i) all Accounts have been paid to Purchaser by Customers or Client, (ii) all Obligations are satisfied in full, (iii) Client has signed a release of any claims and causes of action against Purchaser in the form of Exhibit 1 attached hereto (the "**Release**") and (iv) Purchaser has issued a UCC-3 Amendment financing statement terminating its security interest in the Collateral or its ownership rights in the purchased Accounts. Client understands that the requirement to sign the Release constitutes a waiver of Client's rights under Section 9-513 of the UCC.

    4.3   Upon termination of this Agreement, Client shall pay to Purchaser (or Purchaser may retain or hold in a non-segregated non-interest bearing account) the amount of all Exposed Payments (the "**Preference Reserve**"). Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays or is reasonably likely to pay on account of an avoidance claim asserted under Section 547 of the Bankruptcy Code (i.e., Preferential Transfer or under any other state statute offering similar relief. Purchaser shall refund to Client from time to time that balance of the Preference Reserve for which no preference claim may no longer be asserted due to the expiration of the statute of limitations, settlement with any trustee or otherwise.

5.  GRANT OF SECURITY INTEREST.

    In addition to Purchaser's rights of ownership in the Accounts purchased, and in order to secure the repayment of the Obligations, Client grants Purchaser a security interest in all of Client's present and future Collateral. Client will help Purchaser obtain a satisfactory control agreement for any Collateral consisting of deposit accounts, investment property, letter-of-credit rights, and electronic chattel paper and will deliver to Purchaser the original of all Collateral consisting of instruments, documents, letter of credit or other negotiable collateral. Client will comply with all appropriate laws in order to perfect Purchaser's ownership interests in the Accounts and security interest in the Collateral and will execute all documents that Purchaser may require. Client authorizes Purchaser to file all financing statements, continuations and amendments under the UCC in effect in any applicable jurisdiction to perfect Purchaser's ownership interests in the Accounts and security interest in the Collateral. Purchaser may file financing statements, continuation statements and amendments that describe the Collateral as "all assets" of Client or similar words and which contain any other information required by the UCC. Client acknowledges that it is not authorized to file and shall not cause to be filed any financing statement, amendment or termination statement with respect to any financing statement naming Client as the debtor and Purchaser as the secured party without the prior written consent of Purchaser. Client hereby ratifies Purchaser's authorization to file any UCC financing statements previously filed by Purchaser. In order to satisfy any of the

    Initials *ISTU*

6

Obligations, Client authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Client.

6. REPRESENTATIONS, WARRANTIES AND COVENANTS.

Client warrants and/or covenants at the time of submission of each Schedule of Accounts and during the term of this Agreement and so long as any Obligations remain unpaid that: (a) Client is a registered organization duly organized, existing, and in good standing under the laws of the state or country of its formation as set forth on **Item 15** of the Schedule, and is qualified to do business in all countries, states and provinces where Client is required to be qualified. Client has the power and authority, and has taken all necessary action, to make, deliver and perform this Agreement; (b) Client has not, during the 5 years preceding the Agreement, been at any other location or used any other corporate or fictitious name, except as disclosed to Purchaser in writing. Client will not do business under any trade names except as indicated to Purchaser in **Item 16** of the Schedule. Purchaser is authorized to receive, endorse and deposit any checks sent to it in payment of Accounts, including such checks payable to any authorized and disclosed trade names. (c) Client's business is solvent, and to the best of Client's knowledge, each Customer's business is solvent; (d) Client will file all tax returns and other reports Client is required by law to file, will pay promptly all taxes, assessments, and other similar charges and will provide any proof of such payments that Purchaser may request; (e) Client has good and undisputed title to all Accounts offered to or purchased by Purchaser, and each invoice evidencing an Account is an accurate and undisputed statement of terms between Customer and Client, the payment terms will be for a sum certain which is due and payable on such terms as referenced in **Item 12** of the Schedule as are acceptable to Purchaser in its discretion, is an accurate statement of a bona fide sale, delivery and acceptance of merchandise or performance of service by Client to Customer, is not an Account from a subsidiary or affiliate of Client is not subject to any Dispute or counterclaim deduction of any kind and payment will only be made by each the Customer to whom an invoice is issued. Client will not change or modify the terms of any Account offered for sale unless Purchaser first consents to such change in writing; (f) All of the Collateral is owned by Client alone, free and clear of all liens, security interests or encumbrances except those granted to Purchaser or the Permitted Liens set forth on **Item 17** of the Schedule, and Client will not transfer, pledge or give a security interest in or permit any person to hold a lien upon any of its Collateral; (g) Client will maintain such insurance covering Client's business and/or the goods sold to Client's Customers as is customary for businesses similar to Client's and, at the request of Purchaser, name Purchaser as lender loss payee or additional insured (as applicable) of such insurance; (h) unless Purchaser gives its prior written consent, Client will not obtain or attempt to obtain from any party other than Purchaser any loans, advances or other financial accommodations or indebtedness of any kind, nor will Client enter into any direct or indirect guaranty of any obligation of another party; (i) Client will not engage in any transactions with any affiliate of Client except for "arm's length" transactions in the normal course of business, which transactions have been disclosed to Purchaser in advance and in writing; (j) Client will, when requested by Purchaser, execute any written instruments and do any other things necessary to carry out the purposes of this Agreement; (k) Client will furnish Purchaser with financial statements and other information as reasonably requested by Purchaser from time to time, which statements and information will be true and accurate; (l) Client will offer all of its Accounts only to Purchaser until a complete termination of this Agreement occurs as provided in section 4.2; (m) Client's Federal Employment Identification Number is correctly stated in **Item 18** the Schedule; (n) Client will make each payment required under this Agreement to Purchaser without setoff, deduction or counterclaim and will not pledge the credit of Purchaser to any person or business for any purpose whatsoever; (o) Client makes the representations and warranties set forth on **Item 19** of the Schedule. (p) Client has the corporate or limited liability company power and authority to make, deliver and perform this Agreement and the other agreements hereunder and has taken all corporate or limited liability company action necessary to be taken by it to, *inter alia*,

Initials *BTO*

7

authorize the sale of its Accounts on the terms and conditions of this Agreement; (q) Client does not own, control or exercise dominion over, directly or indirectly and in any way whatsoever, the business of any Customer; (r) Client shall not, under any circumstances or in any manner whatsoever, interfere with any of Purchaser's rights under this Agreement; (s) Client will notify Purchaser in writing prior to any proposed or actual change in Client's principal place of business or state of formation, any change in Client's principal executive office or the office or offices where Client's books and records concerning Accounts are regularly maintained or Client's name, location, identity, legal entity or corporate structure; (t) Client will, when requested by Purchaser, execute any written instruments and do any other things necessary to effectuate more fully the purposes and provisions of this Agreement; (u) Client will promptly notify Purchaser of any attachment or any other legal process levied against Client or any of Customers known to Client; (v) Client will, immediately upon sale of Accounts to Purchaser, make proper entries on its books and records disclosing the absolute sale of said Accounts to Purchaser; (w) Client agrees to execute any and all forms (e.g., Form 8821) that Purchaser (or Purchaser's authorized third party provider) may require in order to enable Purchaser to obtain and receive tax information issued by the Department of the Treasury, Internal Revenue Service, or receive refund checks. Client agrees that it shall at no time prior to fully discharging all of its Obligations to Purchaser submit any Form 8821 or otherwise take or authorize anyone else to take any action that may cause a revocation of Purchaser's rights under a Form 8821; (x) Client will make each payment required hereunder, and/or under any instrument delivered to Purchaser, without setoff or deduction; (y) Client shall indemnify Purchaser from any loss arising out of the assertion of any Exposed Payment and shall pay to Purchaser on demand the amount thereof and (z) Client shall not enter into any oral or written agreement with any business in order to arrange for secured or unsecured financing on any one or more of the following bases: a split withholding basis whereby a credit card processing company solicits credit card sales between Client and a finance company, a lockbox or trust bank account withholding basis requiring all proceeds of credit card sales to be deposited into a deposit account, whether or not controlled by the finance company and a portion of which is forwarded to Client electronically or otherwise, or, an ACH withholding basis whereby the finance company receives the credit card processing information and deducts a portion directly from the Client's deposit account electronically. Client shall notify Purchaser within two (2) business days of it becoming aware of the assertion of an Exposed Payment.

7.   DISPUTED ACCOUNTS.

Client must immediately notify Purchaser of any Disputes with any Customer. Purchaser may settle any Dispute directly with the Customer. Such settlement does not relieve Client of responsibility for payment of such Account, and Client will immediately pay to Purchaser the full amount of any Account subject to any Dispute less any payment(s) received from the Customer. If Client fails to do so, Purchaser may charge-back the Account to Client. Mistaken or erroneous invoices submitted by Client to Purchaser may, at Purchaser's discretion, be considered an Account subject to a Dispute and be charged-back to Client.

Initials _BCV_

8

8.  **STATEMENTS/DISPOSAL OF DOCUMENTS.**

8.1.  Accounting Statements. Purchaser shall provide Client with information on the Accounts and all charge-backs and a monthly reconciliation of the purchasing relationship relating to billing, collection, charge-backs, Reserve and Advances. All of the foregoing shall be in a format and in such detail, as Purchaser, in its sole business judgment, deems appropriate. Alternatively, any information in respect to this subsection that is available to Client on Purchaser's website may be made available to Client electronically without a paper statement and in lieu of receipt. Each statement, report, or accounting rendered or issued by Purchaser to Client shall be deemed an "Account Stated" between Purchaser and Client, shall be deemed conclusively accurate and binding on Client and shall be admissible in evidence without objection as prima facia evidence, unless within thirty (30) days after the date of issuance Client notifies Purchaser to the contrary in writing, setting forth with specificity the reasons why Client believes such statement, report, or accounting is inaccurate, as well as what Client believes to be correct amount(s) therefor. If the Client gives notice of its disagreement with Purchaser's statement, all matters in such statement that are not objected to in Client's notice, shall be deemed conclusively accurate and binding on Client. Client's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement and Client's failure to do so shall nonetheless bind Client to whatever Purchaser's records would have reported.

8.2.  Disposal of Documents. Client authorizes Purchaser, in its sole discretion, to make computer images of or to dispose of any documents, schedules, invoices or other papers delivered to Purchaser in connection with this Agreement at any time after said documents, schedules, invoices or other papers have been delivered to Purchaser.

9.  **HOLD IN TRUST.**

All payments on Accounts are the sole and exclusive property of Purchaser. If any payments are sent directly to Client, regardless of who the payee is, Client will hold the payments in trust for the benefit of Purchaser and will turn over to Purchaser all payments received in kind within 2 business days following the date of receipt by Client. If any check or other instrument is issued by a Customer or other payor and made payable solely to Purchaser, or to both Purchaser and Client, and such check or other instrument is delivered to Client and not turned over to Purchaser as required hereunder, Purchaser shall at all times have exclusive standing to assert any claim or cause of action regarding such check or other instrument, and Client waives standing to assert any such claim or cause of action regarding such check or other instrument.

10.  **FINANCIAL RECORDS; EXAMS.**

Client will furnish to Purchaser the following (prepared in accordance with GAAP): (i) all financial information required, and in the time required, in order to comply with the Financial Information Requirements set forth in **Item 19** of the Schedule; and (ii) such other data and information as Purchaser may reasonably request. Purchaser will have the right to inspect any of the premises of Client, the Collateral, all books and records related to the Accounts or Client's general business and financial condition. Field examinations are performed for Purchaser's internal use and Purchaser has no obligation to provide Client or Guarantor with the results of the examination or copies of any reports or work papers in whole or in part.

Initials _BYU_

9

11.    CONDITIONS PRECEDENT

Purchaser's obligation to purchase any Accounts is subject to the satisfaction of the following conditions: (a) the filing of all UCC financing statements appropriate to perfect Purchaser's ownership rights in the purchased Accounts and security interests in the Collateral shall have been properly filed in each office in each jurisdiction in which such filings are appropriate; (b) Purchaser shall have received satisfactory results of UCC, litigation, lien and judgment searches on Client, satisfactory due diligence examinations of Client and Client's principals and guarantors, satisfactory responses to pre-funding Account verifications, and satisfactory notification letters to Customers signed by Client; ( c) Purchaser shall have satisfactory response to pre-funding Account verifications; (d) Purchaser shall have received from Client signed notification letters to Customers; (e) Purchaser shall have completed its due diligence examination of Client; and (f) all other documents and legal matters in connection with the Agreement shall be satisfactory to Purchaser.

12.    DEFAULTS; RIGHTS AND REMEDIES ON DEFAULT.

12.1.    Defaults. The occurrence of any of the following events shall constitute a **"Default"**: (a) Client receives payment on any Account and fails to deliver, in kind, such payment to Purchaser within two business days; (b) Client or any guarantor of Client fails to pay any Obligation when due; (c) Client breaches any term, provision, warranty or representation under this Agreement, or under any other agreement between Client and Purchaser; (d) any receiver or trustee is appointed to oversee Client or its assets; (e) Client becomes insolvent or unable to pay debts as they mature, makes a general assignment for the benefit of creditors, fails to pay any federal, state or local taxes when due, or voluntarily files for protection under any bankruptcy or similar law; (f) any involuntary petition in bankruptcy is filed against Client and is not dismissed or stayed within 60 days; (g) any levies or attachment, execution, tax liens, ERISA liens or tax assessments or similar process is issued against the Client or Collateral and is not released within 10 days; (h) any financial statements, certificates, schedules or other statements furnished by Client to Purchaser are false or incorrect; (i) Client refuses to provide any financial statements, certificates, schedules, or other statements required by Purchaser; (j) there is any change in the controlling ownership of Client or Client merges with or into any other business entity; (k) any guarantor of the liabilities and Obligations shall be in default under any agreements to which it is a party, or demand is made on any such guarantor under the terms of any guaranty to which guarantor is a party; (l) the Client's Form 8821 filed with the Internal Revenue Service naming Purchaser as a party to whom information shall be transmitted shall be revoked, changed or terminated due to any action or inaction of Client; or (m) Purchaser, in good faith, deems its rights to performance or its ability to collect the Obligations under this Agreement to be insecure.

12.2.    Remedies. (1) Upon a Default, Purchaser may, without demand or notice exercise all rights and remedies available to it under this Agreement, under the UCC or otherwise, including without limitation, suspend any of its duties or terminate this Agreement and declare all Obligations immediately due and payable. Further, Purchaser's failure to charge or accrue any interest or fees in connection with a "Default" shall not be deemed a waiver by Purchaser of any right to assert such interest or fee at any subsequent time. Without notice or demand, Purchaser may take any actions necessary or reasonable to protect its ownership of the Accounts or its security interest in the Collateral. Without limiting the foregoing, Purchaser shall have the irrevocable right to (a) redirect to Purchaser and open Client's mail; (b) collect any amounts due Client from Customers; ( c) enter upon the premises of Client, without judicial process, or any other places where the Collateral is located, and remove the Collateral or require Client to assemble the Collateral and make it available to Purchaser; (d) demand and enforce payment of

Initials *BTU*

10

the Accounts; (e) settle, adjust, extend or release the Accounts; (f) sell or assign the Accounts; (g) take control of any item of payment or proceeds; (h) prepare, file and sign Client's name on any proof of claim in bankruptcy or similar document in connection with the Accounts or any Account debtor; (i) do all acts and things necessary, in Purchaser's sole discretion, to fulfill Client's Obligations under this Agreement; (j) endorse the name of Client on any document, instrument, or agreement relating to the Accounts or inventory; (k) use Client's stationery and sign the name of Client to notices and verifications of the Accounts; (l) obtain and use any information relating to the Accounts or inventory to which Client has access; (m) require Client to repurchase the uncollected Accounts; (n) cease purchasing Accounts from Client; (o) reduce the advance rate on eligible Accounts; (p) sell or dispose of any Collateral in any manner and on any terms reasonable to Purchaser; (q) use, without charge, Client's premises, labels, name, trade names, trademarks and advertising matter, or any similar property or rights in order to assemble or sell the Collateral; or (r) limit or terminate Client's access to Purchaser's online services. The proceeds realized from the sale of any Collateral shall be applied first to the reasonable costs, expenses and attorneys' fees incurred by Purchaser for enforcement of its rights under this Agreement including for collection, storage and sale of the Collateral, and second to Obligations owed Purchaser by Client. Client shall remain liable to Purchaser for any deficiency.

(2) After a Default, if Purchaser seeks equitable relief, Client waives any requirement that Purchaser post any bond. Alternatively, if Purchaser desires to post a bond, Purchaser may file with the court a bond in an amount up to ten thousand dollars notwithstanding any common or statutory law requirement to the contrary, and Purchaser will be entitled to all benefits as if such bond were posted in compliance with state law. Client waives any right it may be entitled to (including attorney's fees or costs) if any equitable relief awarded to Purchaser is vacated, dissolved or reversed. All post-judgment interest will be 18% per annum or, if greater, the highest rate as may be allowed by law. Client acknowledges that the information Purchaser makes available to Client satisfies any duty to respond to a Request for an Accounting or Request regarding a Statement of Account referenced in § 9-210 of the UCC. It will be presumed commercially reasonable and Purchaser will have no duty to undertake to collect any Account including those in which Purchaser receives information that a Dispute exists. If Purchaser tries to collect from or enforce an obligation of a Customer or other person obligated on Collateral and estimates that the possibility of collection is outweighed by the likely costs that will be incurred, Purchaser may at any time cease any collection efforts, and such action will be considered commercially reasonable. Before Client tries to hold Purchaser responsible for failing to pursue an account debtor or for taking any action that Client considers to be commercially unreasonable, Client must first notify Purchaser, in writing, of all reasons why Client believes Purchaser has acted in any commercially unreasonable manner and advise Purchaser of the action that Client believes Purchaser should take or should cease taking and provide Purchaser with not less than thirty (30) days to consider whether or not to adopt Client's position. If Client's position requires the expenditure of funds, Client shall be required to provide such funds to Purchaser as a condition to Purchaser's duty to adopt such position.

13.   MISCELLANEOUS.

13.1      Expenses and Attorneys' Fees. Client has paid Purchaser a non-refundable deposit in the amount set forth in **Item 21** of the Schedule to cover Purchaser's expenses in connection with the documentation of this transaction. Client agrees to pay all costs and expenses (including without limitation reasonable attorney's fees) incurred by Purchaser in connection with the enforcement of this Agreement. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Client

Initials _BTU_

11

with a right to attorney's fees or costs, Client hereby waives any and all rights to hereafter seek attorney's fees or costs hereunder, and Client agrees that Purchaser exclusively shall be entitled to indemnification and recovery of any and all attorney's fees or costs in respect to any litigation based here on, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party.

13.2    Power of Attorney.  Client irrevocably appoints Purchaser its attorney in fact, with power to: (a) strike out Client's address on all invoices, accounts, etc. mailed to Customers and insert Purchaser's address; (b) receive, open and dispose of all mail addressed to Client or to Client's trade names; ( c) endorse Client's name or trade name on any payments that come into the possession of Purchaser, or after a Default, on any other documents relating to any of the Accounts or Collateral; (d) demand, sue for, collect, and give releases for any monies due on Accounts; (e) compromise, prosecute, or defend any action, claim or proceeding related to the Accounts; (f) after a Default, notify the Post Office to change the address for delivery of Client's mail to any address Purchaser may designate; (g) sell or deal with any of the Collateral as completely as if Purchaser were the absolute owner; (h) offer any trade discount to Client's Customers; (i) do any and all things necessary and proper to carry out the purposes of this Agreement. The authority granted Purchaser shall remain in full force and effect until all assigned Accounts and all Obligations are paid in full.

13.3    Hold Harmless.  Client indemnifies and agrees to hold harmless Purchaser from and against any claims, judgments, liabilities, fees and expenses (including attorney's fees) which may be imposed upon or asserted against Purchaser at any time in any way connected with this Agreement or the Collateral.

13.4    Successors and Assigns; Participation.  Purchaser may, without consent of Client, sell, assign, or grant a security interest or participations in or transfer any of its rights and obligations hereunder to one or more persons. Client may not delegate any of its duties or assign its rights hereunder without the prior written consent of Purchaser. This Agreement inures to the benefit of and is binding upon the heirs, executors, administrators, successors and assigns of the parties to it.

13.5    Pass-through.  So long as Client is not in Default, any proceeds of Client's Accounts received by Purchaser that do not relate to Accounts purchased by Purchaser shall be received as a pass-through for the benefit of Client.

13.6    Client's Principals.  In the event any of Client's principals including, but not limited to its equity holders, officers or directors, during the term of the Agreement or while Client remains liable to Purchaser for any obligations under the Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, cause to be formed a new entity or otherwise become associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Client, and, Client transfers any interest in the Accounts purchased to any other person or entity or otherwise authorizes such person or entity to use any of the Client's Collateral or any interest in the Accounts purchased, such entity shall be deemed to have expressly assumed the obligations due Purchaser under the Agreement. With respect to any such person or entity, Purchaser shall be deemed to have been granted Purchaser an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as Debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. Purchaser shall be held harmless by Client and its principals and be relieved of any liability as a result of Purchaser's

Initials _BTU_

12

authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or Security Interests in such entity's assets. Purchaser shall have the right to notify such entity's payors of Purchaser's rights, including without limitation, Purchaser's right to collect all Accounts and payment intangibles, and to notify any creditor of such entity that Purchaser has such rights in such entity's assets.

13.7    Cumulative Rights; Written Waiver; Severability.  All rights, remedies and powers granted to Purchaser are cumulative and may be exercised from time to time as Purchaser may determine. Purchaser may not waive its rights or remedies unless the waiver is in writing and signed by Purchaser. A waiver by Purchaser of a right or remedy under this Agreement on one occasion is not a waiver of the right or remedy on any other occasion. If any provision of this Agreement shall be declared illegal or unenforceable, such provision will be disregarded, and this Agreement shall continue in force as though such provision had not been incorporated herein.

13.8    Governing Law; Jurisdiction; Venue, Waiver of Jury Trial and Service of Process.

13.8.1    THIS AGREEMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, APPLICABLE TO AGREEMENTS EXECUTED, DELIVERED AND PERFORMED WITHIN SUCH STATE WITHOUT REGARD TO THE APLLICATION OF ANY CHOICE OF LAW PRINCIPLES.  CLIENT HEREBY AGREES TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT LOCATED WITHIN PALM BEACH COUNTY, FLORIDA IN ANY ACTION, SUIT OR OTHER PROCEEDING ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT AND IRREVOCABLY WAIVES ANY OBJECTION IT NOW OR HEREAFTER MAY HAVE AS TO SUCH VENUE OF ON THE BASIS THAT SUCH VENUE IS AN INCONVENIENT FORUM OR OTHERWISE. NOTWITHSTANDING THE PRECEDING SENTENCE, NOTHING HEREIN SHALL LIMIT THE RIGHT OF PURCHASER TO BRING PROCEEDINGS AGAINST CLIENT IN THE COURTS OF ANY OTHER JURISDICTION. CLIENT WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON CLIENT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE CERTIFIED MAIL DIRECTED TO CLIENT AT ITS ADDRESS AS IT APPEARS ON **ITEM 21** OF THE SCHEDULE TO THIS AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED TWENTY (20) DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U. S. MAILS, CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTAGE PREPAID.  NOTHING IN THIS SECTION SHALL AFFECT PURCHASER'S RIGHT TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

13.8.2    EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THIS AGREEMENT OR THE DEALINGS OF THE PARTIES HERETO WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

Initials *BTO*

13

13.9     Execution in Counterparts; Execution by Fax or Electronic Mail; Waiver of Acceptance. This Agreement may be executed in separate counterparts, all of which shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any other Factoring Document by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other document executed in conjunction with the Agreement. Any party delivering an executed counterpart of this Agreement or any document executed in conjunction with the Agreement by facsimile or electronic mail also shall deliver an original executed counterpart of this Agreement or such document executed in conjunction with the Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other document executed in conjunction with the Agreement. To the fullest extent permitted by applicable law, Client waives notice of Purchaser's acceptance of this Agreement and the other document executed in conjunction with the Agreement.

13.10     Entire Agreement. This Agreement and the Schedule contains the entire Agreement between the parties and is intended to serve as a fully integrated agreement. Any action on an agreement other than this Agreement relating to this subject matter will fail to satisfy Fla. Stat. 687.0304 and may not be maintained either as a claim or defense. The parties acknowledge that this Agreement was not entered into based on any form of a contemporaneous written or oral agreement. The Schedule is incorporated into this Agreement by reference, and in the event of a conflict between the terms of this Agreement and the terms of the Schedule, the terms of the Schedule shall govern and control. Any addendum or modification to the Agreement or the Schedule must be signed by both parties in order to be effective. Client agrees that by executing this Agreement it waives any right to seek any form of reformation of this Agreement.

IN WITNESS WHEREOF, the parties have set their hand as of the day and year specified at the beginning hereof.

"CLIENT"
RWDY, Inc.

By: _Brian T Owen_

Name: Brian T. Owen
Title: President

"PURCHASER"
Seacoast Business Funding, a division of
Seacoast National Bank

By: _Jerry Shea_

Name: Jerry Shea
Title: Senior Vice President

Initials _BTO_

14

## SCHEDULE TO PURCHASING AGREEMENT

### RWDY, Inc. ("Client")

This Schedule is a part of the foregoing Purchasing Agreement dated as of November 21, 2018 between **RWDY, Inc.** as client ("Client"), and Seacoast Business Funding, a division of Seacoast National Bank, as purchaser ("Purchaser").

1. **Base Index Fee.** The Base Index plus 4.0%

2. **Required Accounts:** All Accounts

3. **Purchasing Fee:** a discount of 0.12% from the face value of each domestic Account for the first 30 days such Account remains unpaid, in whole or in part, plus an additional 0.004% discount shall be charged for each day thereafter that the invoice is outstanding.

4. **Collection Days:** 3 Business Days

5. **Advance Percentage:** up to 90% of the total face amount of all outstanding and unpaid domestic Accounts.

6. **Maximum Advances Outstanding:** $22,000,000.00

7. **Maximum Selling Terms:** 60 Days

8. **Reserve percentage:** 10% of the aggregate face amount of all Accounts purchased.

9. **Advance Limitations:**

The following are conditions precedent to Purchaser's determination as to the making of Advances against the purchase of Accounts:

(i) Inclusion of those Accounts in respect to which less than 90 days have elapsed since the date of original invoice but excluding all Accounts owed by a Customer if the aggregate outstanding dollar amount of such Accounts not considered as eligible under this clause is equal to or greater than 30%;

(ii) Exclusion of all Accounts owed by a Customer if the amount of returns, allowances, credit losses, discounts and other offsets of such Accounts on an historic basis is unacceptable to Purchaser; and excluding

(iii) Exclusion of the value of Accounts owed by a Customer where the dollar value for the aggregate amount of Accounts owed by such Customer is greater than 30% of all of Client's Accounts then funded by Purchaser, unless otherwise approved in the advance by Purchaser.

10. **Repurchase Date:** 90 days from Invoice Date

11. **Minimum Amount of Accounts:** N/A

Initials _BW_

15

| 12. | **Minimum Purchasing Fees.** | N/A |
| 13. | **Expected Annual Purchases Volume:** | N/A |
| 14. | **Other Fees:** | N/A |
| 15. | **State of Formation:** | Texas |
| 16. | **Trade names or Trade styles:** | N/A |
| 17. | **Permitted Liens:** | None |
| 18. | **Federal ID Number:** | 37-1432659 |
| 19. | **Financial Information Requirements:** | |

**Annual:**

(1)  Not later than 120 days after the close of each fiscal year of Client, Client must provide to Purchaser FYE financial statements, including balance sheet and income statements;

(2) Corporate Tax Returns within 15 days of filing with the IRS.  Client must notify Purchaser if any filing extensions have been granted.

(3) Certificate of Insurance Policies (upon renewal).

(4) Personal tax returns of all Guarantors but not later than 12 months after the date of the previously receive statement.

(5) Guarantor Financial Statement to be provided annually but no later than 12 months after the date of previously received statement.

**Monthly:** not later than thirty (30) days after the end of each month, Client must provide to Purchaser:

(1) Balance Sheet and Income Statement

(2) Internally prepared accounts receivable report.

(3) Internally prepared accounts payable report

**Upon Request:**

(1) Month-End Bank Statements

(2) Field Examinations to be conducted bi-annually or immediately upon the occurrence of an Event of Default

(3) Proof of Corporate IRS Payroll Tax Filings upon receipt of filing from the Payroll Company

| 20. | **Term of Agreement:** | 12 Months |
| 21. | **Deposit Amount:** | $7,500.00 |

16

22. **Client's Address:**                     950 Echo Lane, Suite 200
                                              Houston, TX 77024

23. **Special terms:**

(a)     The wire transfer fee as referred in Section 3 Paragraph 3.6 hereof shall be charged at a rate of $15.00 per transfer.

(b)     Client shall be entitled to a rebate of Purchasing Fee set forth **Item 3** of the Schedule for the payments received from by the Account Debtors set forth below that have been received and posted within the 31st to 80th days from original invoice date and provided that no Event of Default has occurred hereunder. If payment is not received by the 80th day from purchase, the incremental Discount Fee of 0.004% will be charge beginning on the 81st day. The rebate will only apply to Accounts arising from the following Account Debtors:

    i.      Horizon Mud Company – Midland, TX

    ii.     Petro-Tech Solution – Minden, LA

    iii.    Strike Too Oil – Albany, TX

    iv.     Weldon Corporation – Houston, TX

(c)     In the event that the company is sold to an independent third party, Purchaser shall be entitled to a termination fee of 1.0% of the Maximum Credit Facility. If the Agreement is terminated for any other reason prior to the Termination Date or any anniversary, Purchaser shall be entitled to a termination fee of 1.5% of the Maximum Credit Facility.

"CLIENT"
RWDY, Inc.

By: _____
Name: Brian T. Owen
Title:    President

"PURCHASER"
Seacoast Business Funding, a division of Seacoast National Bank

By: _____
Name: Jerry Shea
Title:    Senior Vice President

17

## EXHIBIT 1

### General Release

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits **Seacoast Business Funding, a division of Seacoast National Bank** ("Releasee"), its parent, directors, shareholders, agents and employees, of and from any and all claims of every type, kind, nature, description or character ("Claims"), and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in way connected to or are related to that certain Purchasing Agreement dated November 21, 2018. Releasor agrees that the matters released herein are not limited to matters which are known or disclosed, and the Releasor waives any and all rights and benefits which it now has, or in the future may have.

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for or the preparation of this Release, or (b) it has knowingly determined that such advice is not needed.

DATED: November 21, 2018

Name of Company: **RWDY, Inc.**

By: _____
Name: Brian T. Owen
Title: President

18

FIRST AMENDMENT TO
PURCHASING AGREEMENT

This FIRST AMENDMENT TO PURCHASING AGREEMENT (this "Amendment") is made, entered into and effective as of the 26th day of March, 2019 ("Effective Date") by and between RWDY, Inc. (referred to as "Client") and Seacoast Business Funding, a division of Seacoast National Bank ("Purchaser").

WHEREAS Purchaser and Client are parties to a certain Purchasing Agreement, dated November 21, 2018 (the "Agreement") pursuant to which Purchaser purchases Accounts from Client and makes other financial accommodations to Client, which purchases and financial accommodations are secured by security interests upon the Collateral; and

WHEREAS, the parties desire to amend the Agreement as hereinafter set forth;

NOW THEREFORE, in consideration of the mutual conditions and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Definitions.  Capitalized terms used in this Amendment, unless otherwise defined herein, shall have the meaning ascribed to such term in the Agreement or the Uniform Commercial Code as in effect from time to time in the State of Florida.

2.      Amendments.   Subject to the conditions set forth below, this is to confirm pursuant to mutual consent and understanding that the Agreement shall be amended to excluded **EOG Resources** as a Customer and any accounts generated from **EOG Resources** are not eligible accounts under the Agreement.

3.      Conditions.   The effectiveness of this Amendment is subject to the following conditions precedent (unless specifically waived in writing by Purchaser):

(a)      Client shall have executed and delivered such other documents and instruments as Purchaser may require;

(b)      All proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Purchaser and its legal counsel;

(c)      No Default shall have occurred and be continuing; and

(d)      There shall have occurred no material adverse change in the business, operations, financial condition, profits or prospects of Client, or in the Collateral.

4.      Representations and Warranties of Client.  Client represents and warrants that (a) no Default exists under the Agreement or under the Amendment; (b) the representations and warranties of Client contained in the Agreement and in the Amendment were true and correct in all material respects when made and continue to be true and correct in all material respects on the date hereof; (c) the execution, delivery and performance by Client of this Amendment and the consummation of the transactions contemplated hereby are within the legal power of Client and have been duly authorized by all necessary company action on the part of Client, do not require any approval or consent, or filing with, any governmental agency or authority, do not violate any provisions of any law, rule or regulation or any provision of any order, writ, judgment, injunction, decree, determination or award presently in effect in

which Client is named or any provision of the charter documents of Client and do not result in a breach of or constitute a default under any agreement or instrument to which Client is a party or by which it or any of its properties are bound; (d) this Amendment constitutes the legal, valid and binding obligation of Client, enforceable against Client in accordance with its terms; (e) all payroll taxes required to be withheld from the wages of Client's employees have been paid or deposited when due; (f) Client is entering into this Amendment freely and voluntarily with the advice of legal counsel of its own choosing; and (g) Client has freely and voluntarily agreed to the releases, waivers and undertakings set forth in this Amendment.

5.    Reaffirmation of Obligations.  Client hereby ratifies and reaffirms the Agreement and all of its obligations and liabilities there under.  Client acknowledges and agrees that all terms and provisions, covenants and conditions of the Agreement shall be and remain in full force and effect and constitute the legal, valid, binding and enforceable obligations of Client in accordance with their respective terms as of the date hereof. Client shall pay to Purchaser all costs and expenses, including legal fees, incurred by Purchaser in connection with preparation, negotiation and closing of this Amendment.

6.    Ratification.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Agreement, and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Agreement.  Except as expressly modified and superseded by this Amendment, the terms and provisions of the Agreement are ratified and confirmed and shall continue in full force and effect.

7.    No Novation, etc.  This Amendment is not intended to be, nor shall it be construed to create, a novation or accord and satisfaction, and the Agreement, as amended hereby, shall remain in full force and effect.  Notwithstanding any prior mutual temporary disregard of any of the terms of the Agreement, the parties agree that the terms of the Agreement shall be strictly adhered to on and after the date hereof, except as expressly modified by this Amendment.

8.    Release of Claims.  To induce Purchaser to enter into this Amendment, Client hereby releases, acquits and forever discharges Purchaser, and Purchaser's officers, directors, agents, employees, successors and assigns, from all liabilities, claims, demands, actions or causes of action of any kind (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any one or more of them now have or ever have had against Purchaser, whether arising under or in connection with the Agreement, or otherwise.

9.    Waiver of Limitations Period.  Client hereby waives the benefit of any statute of limitations that might otherwise bar the recovery of any of the Obligations from any one or more of them.

10.    Non-Waiver of Default.  Neither this Amendment nor Purchaser's continued making of loans or other extensions of credit at any time extended to Client in accordance with the Agreement shall be deemed a waiver of or consent to any Default.  Client agrees that such Defaults shall not be deemed to have been waived, released or cured by virtue of advances, loans or other extensions of credit at any time extended to Client pursuant to the terms of the Agreement or the execution of this Amendment.

11.    Relationship of Parties; No Third Party Beneficiaries.  Nothing in this Amendment shall be construed to alter the existing debtor-creditor relationship between Client and Purchaser to one other than a debtor-creditor relationship.  This Amendment is not intended, nor shall it be construed, to create a partnership or joint venture relationship between or among any of the parties hereto.  No person other than a party hereto is intended to be a beneficiary hereof and no person other than a party hereto shall be authorized to rely upon or enforce the contents of this Amendment.

12.     <u>Severability</u>.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

13.     <u>References</u>.  Any reference to the Agreement contained in any document, instrument or agreement executed in connection with the Agreement, shall be deemed to be a reference to the Agreement as modified by this Amendment.

14.     <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument.

15.     <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, heirs and personal representatives.

        IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed under seal and delivered by their respective duly authorized officers on the date first written above.

Seacoast Business Funding, a division of
Seacoast National Bank

By: _____
Name:  Jerry Shea
Title:  Senior Vice President


RWDY, Inc.

By: _____
Name:  Brian T. Owen
Title:  President

SECOND AMENDMENT TO
PURCHASING AGREEMENT

This SECOND AMENDMENT TO PURCHASING AGREEMENT (this "Amendment") is made, entered into and effective as of the _9th_ day of May, 2019 ("Effective Date") by and between RWDY, Inc. (referred to as "Client") and Seacoast Business Funding, a division of Seacoast National Bank ("Purchaser").

WHEREAS Purchaser and Client are parties to a certain Purchasing Agreement, dated November 21, 2018 (the "Agreement") pursuant to which Purchaser purchases Accounts from Client and makes other financial accommodations to Client, which purchases and financial accommodations are secured by security interests upon the Collateral; and

WHEREAS, the parties desire to amend the Agreement as hereinafter set forth;

NOW THEREFORE, in consideration of the mutual conditions and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. _Definitions_. Capitalized terms used in this Amendment, unless otherwise defined herein, shall have the meaning ascribed to such term in the Agreement or the Uniform Commercial Code as in effect from time to time in the State of Florida.

2. _Amendments_. Subject to the conditions set forth below, the Agreement is amended as follows:

Item 6 of the Schedule to Purchase Agreement is amended by deleting the section in its entirety and replacing the following in lieu thereof:

"6. Maximum Advances Outstanding: $25,000,000.00"

3. _Conditions_. The effectiveness of this Amendment is subject to the following conditions precedent (unless specifically waived in writing by Purchaser):

(a) Client shall have executed and delivered such other documents and instruments as Purchaser may require;

(b) All proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Purchaser and its legal counsel;

(c) No Default shall have occurred and be continuing; and

(d) There shall have occurred no material adverse change in the business, operations, financial condition, profits or prospects of Client, or in the Collateral.

4. _Representations and Warranties of Client_. Client represents and warrants that (a) no Default exists under the Agreement or under the Amendment; (b) the representations and warranties of Client contained in the Agreement and in the Amendment were true and correct in all material respects when made and continue to be true and correct in all material respects on the date hereof; (c) the execution, delivery and performance by Client of this Amendment and the consummation of the transactions

contemplated hereby are within the legal power of Client and have been duly authorized by all necessary company action on the part of Client, do not require any approval or consent, or filing with, any governmental agency or authority, do not violate any provisions of any law, rule or regulation or any provision of any order, writ, judgment, injunction, decree, determination or award presently in effect in which Client is named or any provision of the charter documents of Client and do not result in a breach of or constitute a default under any agreement or instrument to which Client is a party or by which it or any of its properties are bound; (d) this Amendment constitutes the legal, valid and binding obligation of Client, enforceable against Client in accordance with its terms; (e) all payroll taxes required to be withheld from the wages of Client's employees have been paid or deposited when due; (f) Client is entering into this Amendment freely and voluntarily with the advice of legal counsel of its own choosing; and (g) Client has freely and voluntarily agreed to the releases, waivers and undertakings set forth in this Amendment.

5.    <u>Reaffirmation of Obligations</u>. Client hereby ratifies and reaffirms the Agreement and all of its obligations and liabilities there under. Client acknowledges and agrees that all terms and provisions, covenants and conditions of the Agreement shall be and remain in full force and effect and constitute the legal, valid, binding and enforceable obligations of Client in accordance with their respective terms as of the date hereof. Client shall pay to Purchaser all costs and expenses, including legal fees, incurred by Purchaser in connection with preparation, negotiation and closing of this Amendment.

6.    <u>Ratification</u>. The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Agreement, and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Agreement. Except as expressly modified and superseded by this Amendment, the terms and provisions of the Agreement are ratified and confirmed and shall continue in full force and effect.

7.    <u>No Novation, etc</u>. This Amendment is not intended to be, nor shall it be construed to create, a novation or accord and satisfaction, and the Agreement, as amended hereby, shall remain in full force and effect. Notwithstanding any prior mutual temporary disregard of any of the terms of the Agreement, the parties agree that the terms of the Agreement shall be strictly adhered to on and after the date hereof, except as expressly modified by this Amendment.

8.    <u>Release of Claims</u>. To induce Purchaser to enter into this Amendment, Client hereby releases, acquits and forever discharges Purchaser, and Purchaser's officers, directors, agents, employees, successors and assigns, from all liabilities, claims, demands, actions or causes of action of any kind (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any one or more of them now have or ever have had against Purchaser, whether arising under or in connection with the Agreement, or otherwise.

9.    <u>Waiver of Limitations Period</u>. Client hereby waives the benefit of any statute of limitations that might otherwise bar the recovery of any of the Obligations from any one or more of them.

10.    <u>Non-Waiver of Default</u>. Neither this Amendment nor Purchaser's continued making of loans or other extensions of credit at any time extended to Client in accordance with the Agreement shall be deemed a waiver of or consent to any Default. Client agrees that such Defaults shall not be deemed to have been waived, released or cured by virtue of advances, loans or other extensions of credit at any time extended to Client pursuant to the terms of the Agreement or the execution of this Amendment.

11.    <u>Relationship of Parties; No Third Party Beneficiaries</u>. Nothing in this Amendment shall be construed to alter the existing debtor-creditor relationship between Client and Purchaser to one other than a debtor-creditor relationship. This Amendment is not intended, nor shall it be construed, to create a partnership or joint venture relationship between or among any of the parties hereto. No person other



than a party hereto is intended to be a beneficiary hereof and no person other than a party hereto shall be authorized to rely upon or enforce the contents of this Amendment.

12.  **Severability**.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

13.  **References**.  Any reference to the Agreement contained in any document, instrument or agreement executed in connection with the Agreement, shall be deemed to be a reference to the Agreement as modified by this Amendment.

14.  **Counterparts**.  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument.

15.  **Successors and Assigns**.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, heirs and personal representatives.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed under seal and delivered by their respective duly authorized officers on the date first written above.

Seacoast Business Funding, a division of
Seacoast National Bank

By: _____
Name: Jerry Shea
Title: Senior Vice President

RWDY, Inc.

By: _____
Name: Brian T. Owen
Title: President

THIRD AMENDMENT TO
PURCHASING AGREEMENT

This **THIRD AMENDMENT TO PURCHASING AGREEMENT** (this "Amendment") is made, entered into and effective as of the *16th* day of October, 2019 ("Effective Date") by and between RWDY, Inc. (referred to as "Client") and Seacoast Business Funding, a division of Seacoast National Bank ("Purchaser").

WHEREAS Purchaser and Client are parties to a certain Purchasing Agreement, dated November 21, 2018, as amended from time to time (as amended, the "Agreement") pursuant to which Purchaser purchases Accounts from Client and makes other financial accommodations to Client, which purchases and financial accommodations are secured by security interests upon the Collateral; and

WHEREAS, the parties desire to amend the Agreement as hereinafter set forth;

NOW THEREFORE, in consideration of the mutual conditions and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. <u>Definitions</u>. Capitalized terms used in this Amendment, unless otherwise defined herein, shall have the meaning ascribed to such term in the Agreement or the Uniform Commercial Code as in effect from time to time in the State of Florida.

2. <u>Amendments</u>. Subject to the conditions set forth below, the Agreement is amended as follows:

A. This is to confirm pursuant to mutual consent and understanding that the Agreement shall be amended to excluded **Horizon Mud** as a Customer and any accounts generated from **Horizon Mud** are not eligible accounts under the Agreement.

B. Section 4.1 of the Agreement is deleted in its entirety, and the following is substituted in its place:

"4.1     This Agreement shall continue in effect from the date of this Agreement through the end of the Term of the Agreement specified in Item 20 of the Schedule and will automatically renew for successive 12 month periods (each such date being the "Termination Date") unless terminated as follows: (a) Purchaser may terminate the Agreement at any time by giving Client 60 days prior written notice, or with no notice required upon the occurrence of any Default; or (b) Client may terminate this Agreement on the Termination Date by giving Purchaser at least 60 days but no more than 90 days prior written notice, by certified mail. Upon the occurrence of any Default by Client, Purchaser may terminate this Agreement immediately, without notice, and upon such termination due to any Default, Client shall immediately pay to Purchaser the prepayment penalty as provided in **Item 23** of the Schedule."

C. Section 10 of the Agreement is deleted in its entirety, and the following is substituted in its place:

"10.     FINANCIAL RECORDS; EXAMS.
Client will furnish to Purchaser the following (prepared in accordance with GAAP): (i) all financial information required, and within the time required, in order to comply with the Financial Information Requirements set forth in Item 19 of the Schedule; and (ii) such other data and information as Purchaser may reasonably request. Purchaser will have the right to

inspect any of the premises of Client, the Collateral, all books and records related to the Accounts or Client's general business and financial condition. Field examinations are performed for Purchaser's internal use and Purchaser has no obligation to provide Client or Guarantor with the results of the examination or copies of any reports or work papers in whole or in part. The costs of such field examinations shall be paid by the Client at the rate of $1,000.00 per man day, including the time to prepare all reports, plus all expenses.

D. Item 6 of the Schedule to the Agreement is deleted in its entirety, and the following is substituted in its place:

"6. Maximum Advances Outstanding:     $30,000,000.00"

E. Item 9 of the Schedule to the Agreement is deleted in its entirety, and the following is substituted in its place:

"9. Advance Limitations:
The following are conditions precedent to Purchaser's determination as to the making of Advances against the purchase of Accounts:

(i) Inclusion of those Accounts in respect to which less than 90 days have elapsed since the date of original invoice but excluding all Accounts owed by a Customer if the aggregate outstanding dollar amount of such Accounts not considered as eligible under this clause is equal to or greater than 30%;
(ii) Exclusion of all Accounts owed by a Customer if the amount of returns, allowances, credit losses, discounts and other offsets of such Accounts on an historic basis is unacceptable to Purchaser; and
(iii) Exclusion of the value of Accounts owed by a Customer where the dollar value for the aggregate amount of Accounts owed by such Customer is greater than 25% of all of Client's Accounts then funded by Purchaser, unless the Accounts are covered and insured by credit insurance in an amount and with underwriters acceptable to Purchaser, and payable to Purchaser, with the cost of such credit insurance payable by Client, unless otherwise approved in the advance by Purchaser."

F. Subitem (1) under the annual requirements in Item 19 of the Schedule to the Agreement is deleted in its entirety, and the following is substituted in its place:

"(1)     Not later than 120 days after the close of each fiscal year of Client, Client must provide to Purchaser FYE financial statements, including balance sheet and income statements prepared and reviewed by a certified public accountant acceptable to Purchaser;"

G. Item 23 of the Schedule to the Agreement is amended as follows:
   (i)     Sub-item (c) is deleted in its entirety, and the following is substituted in its place:

"(c)     In the event that majority of the assets or equity of the Client is sold to an independent third party, Purchaser shall be entitled to a termination fee of 1.0% of the Maximum Credit Facility. If the Agreement is terminated for any other reason prior to the Termination Date or any anniversary thereof, including, without limitation, upon the occurrence of a Default, the Purchaser shall be entitled to a termination fee of 1.5% of the then applicable Maximum Credit Facility. Notwithstanding the above, in the event that the that the equity of the Client is sold/transferred to an Employee Stock Ownership Plan, and there is no Default, no termination fee shall be due."

(ii)    By the additions of sub-items (d) and (e) to provide as follows:

"(d)    Client shall maintain a Tangible Net Worth, plus the outstanding principal balance of Subordinated Debt, of at least $6,000,000.00 at all times.  As used herein, "Tangible Net Worth" means, as of any date, the total assets of Client minus the total liabilities of Client calculated in conformity with GAAP, less (i) all amounts due from Client's employees, equity holders, affiliates and other related third parties, (ii) the Master Service Agreement-DPRO, as reflected on Client's balance sheet,  and (iii) the amount of all intangible items reflected therein, including all unamortized debt discount and expense, unamortized research and development expense, unamortized deferred charges, goodwill, intellectual property, unamortized excess cost of investments in subsidiaries over equity at dates of acquisition, and all similar items which should properly be treated as intangibles in accordance with GAAP.  "Subordinated Debt" means all of the indebtedness owed by any third party, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of a subordination agreement approved by Purchaser in its discretion.

(e)  Client shall maintain a ratio of Tangible Net Worth, plus the outstanding principal balance of Subordinated Debt less intangible assets to total liabilities less Subordinated Debt of at least 5.0 to 1.0 at the end of each fiscal quarter."

3.    Conditions.  The effectiveness of this Amendment is subject to the following conditions precedent (unless specifically waived in writing by Purchaser):

(a)    Client shall have executed and delivered such other documents and instruments as Purchaser may require;

(b)    All proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be satisfactory to Purchaser and its legal counsel;

(c)    No Default shall have occurred and be continuing; and

(d)    There shall have occurred no material adverse change in the business, operations, financial condition, profits or prospects of Client, or in the Collateral.

4.    Representations and Warranties of Client.  Client represents and warrants that (a) no Default exists under the Agreement or under the Amendment; (b) the representations and warranties of Client contained in the Agreement and in the Amendment were true and correct in all material respects when made and continue to be true and correct in all material respects on the date hereof; (c) the execution, delivery and performance by Client of this Amendment and the consummation of the transactions contemplated hereby are within the legal power of Client and have been duly authorized by all necessary company action on the part of Client, do not require any approval or consent, or filing with, any governmental agency or authority, do not violate any provisions of any law, rule or regulation or any provision of any order, writ, judgment, injunction, decree, determination or award presently in effect in which Client is named or any provision of the charter documents of Client and do not result in a breach of or constitute a default under any agreement or instrument to which Client is a party or by which it or any of its properties are bound; (d) this Amendment constitutes the legal, valid and binding obligation of Client, enforceable against Client in accordance with its terms; (e) all payroll taxes required to be withheld from the wages of Client's employees have been paid or deposited when due; (f) Client is entering into this Amendment freely and voluntarily with the advice of legal counsel of its own choosing;



and (g) Client has freely and voluntarily agreed to the releases, waivers and undertakings set forth in this Amendment.

5.     Reaffirmation of Obligations.  Client hereby ratifies and reaffirms the Agreement and all of its obligations and liabilities thereunder.  Client acknowledges and agrees that all terms and provisions, covenants and conditions of the Agreement shall be and remain in full force and effect and constitute the legal, valid, binding and enforceable obligations of Client in accordance with their respective terms as of the date hereof, without any setoffs, defenses or counterclaims of any kind whatsoever. Brian T. Owen ("Guarantor") hereby consents to the terms of this Amendment and ratifies and reaffirms his Unlimited Guaranty (the "Guaranty") and all of its obligations and liabilities thereunder.  Guarantor acknowledges and agrees that all terms and provisions, covenants and conditions of the Agreement and the Guaranty shall be and remain in full force and effect and constitute the legal, valid, binding and enforceable obligations of Guarantor in accordance with their respective terms as of the date hereof, without any setoffs, defenses or counterclaims of any kind whatsoever. Client and Guarantor, jointly and severally, shall pay to Purchaser all costs and expenses, including legal fees, incurred by Purchaser in connection with preparation, negotiation and closing of this Amendment.

6.     Ratification.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Agreement, and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Agreement.  Except as expressly modified and superseded by this Amendment, the terms and provisions of the Agreement are ratified and confirmed and shall continue in full force and effect.

7.     No Novation, etc.  This Amendment is not intended to be, nor shall it be construed to create, a novation or accord and satisfaction, and the Agreement, as amended hereby, shall remain in full force and effect.  Notwithstanding any prior mutual temporary disregard of any of the terms of the Agreement, the parties agree that the terms of the Agreement shall be strictly adhered to on and after the date hereof, except as expressly modified by this Amendment.

8.     Release of Claims.  To induce Purchaser to enter into this Amendment, Client and Guarantor jointly and severally hereby release, acquit and forever discharge Purchaser, and Purchaser's officers, directors, agents, employees, successors and assigns, from all liabilities, claims, demands, actions or causes of action of any kind (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any one or more of them now have or ever have had against Purchaser, whether arising under or in connection with the Agreement, the Guaranty or otherwise.

9.     Waiver of Limitations Period.  Client and Guarantor hereby waive the benefit of any statute of limitations that might otherwise bar the recovery of any of the Obligations from any one or more of them.

10.     Non-Waiver of Default.  Neither this Amendment nor Purchaser's continued making of loans or other extensions of credit at any time extended to Client in accordance with the Agreement shall be deemed a waiver of or consent to any Default.  Client agrees that such Defaults shall not be deemed to have been waived, released or cured by virtue of advances, loans or other extensions of credit at any time extended to Client pursuant to the terms of the Agreement or the execution of this Amendment.

11.     Relationship of Parties; No Third-Party Beneficiaries.  Nothing in this Amendment shall be construed to alter the existing debtor-creditor relationship between Client and Purchaser to one other than a debtor-creditor relationship.  This Amendment is not intended, nor shall it be construed, to create a partnership or joint venture relationship between or among any of the parties hereto.  No person other than a party hereto is intended to be a beneficiary hereof and no person other than a party hereto shall be authorized to rely upon or enforce the contents of this Amendment.

12.    <u>Severability</u>.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

13.    <u>References</u>.    Any reference to the Agreement contained in any document, instrument or agreement executed in connection with the Agreement, shall be deemed to be a reference to the Agreement as modified by this Amendment.

14.    <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument.

15.    <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, heirs and personal representatives.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed under seal and delivered by their respective duly authorized officers on the date first written above.

Seacoast Business Funding, a division of
Seacoast National Bank


By:_____
Name:  Jerry Shea
Title:    Senior Vice President


RWDY, Inc.

By:_____
Name:  Brian T. Owen
Title:    President


_____
Name:  Brian T. Owen, Individually