EXHIBIT 7

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement"), dated October 1, 2013, is entered into by and between DRILL PRO CONSULTING, LLC, a Louisiana limited liability company ("Seller"), Seller's owners, Kenneth Lowery ("Lowery") and Jason Brazzel ("Brazzel"); and RWDY, INC., a Texas corporation ("Buyer") and its owner, Brian T. Owen ("Owen").

WHEREAS, Seller is the owner of a certain tangible and intangible business assets, as described herein (herein the "Assets"); and

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of the Assets, upon the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of the premises, the representations, warranties, agreements and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I

## PURCHASE AND SALE

1.1    Sale of Assets. Subject to the terms and conditions set forth herein, Seller shall sell, assign, convey and deliver unto Buyer at Closing all of the tangible and intangible property described in Exhibit "A", annexed hereto and made a part hereof for all purposes (herein the "Assets"). Transfer of title at Closing will be evidenced by delivery of an executed Assignment and Bill of Sale in the form annexed hereto and made a part hereof as Exhibit "B".

1.2    Purchase Price. The Purchase Price paid for the Assets shall be Two Million Dollars ($2,000,000.00 U.S.) paid as follows, by certified check or wire transfer to Seller's account:

$200,000.00 at the time the Agreement is signed;
$400,000.00 at Closing;
$350,000.00 on January 15, 2015;
$350,000.00 on July 15, 2015;
$350,000.00 on January 15, 2016;
$350,000.00 on July 15, 2016.

The Purchase Price will be subject to adjustment only as provided in Section 1.6 herein and no other adjustments, deductions or setoffs shall be permitted.

As additional consideration for the sale and for the Special Provisions set forth in Article V relating to Lowery and Brazzel, at Closing Buyer shall be obligated to pay to Lowery a sum equal to ten percent (10%) of the net sales proceeds realized from the sale of RWDY or its assets on any sale within the next ten (10) years from the date of this Agreement and to Brazzel an equal ten percent (10%) net proceeds interest on the same terms as the Lowery interest with the result that Lowery and Brazzel will together receive twenty percent (20%) of the net sales

1

EXHIBIT 7

proceeds realized in any sale of Buyer's equity or assets within the ten (10) year period (herein the "Net Sales Proceeds Interest").

1.3 Warranties. Seller's warranties shall be limited, as follows:

(a) Seller shall warrant its title to the Assets but shall give no warranty of condition or fitness for use or warranty against latent defects with respect to any equipment, fixtures or furnishings included in the Assets, all such property being sold AS IS/WHERE IS. This limitation of warranty shall be deemed to expressly cover and exclude, and Buyer hereby waives and releases, all claims or actions in redhibition or under any other statutory or common law warranty of condition or fitness for particular use. Buyer acknowledges it will have the opportunity to inspect all of the property constituting the Assets prior to Closing.

(b) With regard to Master Service Agreements ("MSAs") included in the Assets, Seller gives warranty that all such MSAs are in full force and effect and may be assigned to Buyer prior to Closing.

1.4 Effective Date; Closing. The sale contemplated by this Agreement shall be effective as of February 1, 2014 (herein the "Effective Date".) Buyer shall be entitled to all cash attributable to the operation of the Assets from execution of this Agreement through the Effective Date; provided, that accounts payable of the Seller related to the Seller's business shall be paid from such revenue. Buyer shall be entitled to receive and shall own all revenues attributable to the Assets which arise from operations following the Effective Date. In addition, all costs of the Seller attributable to the Assets which have not actually been paid prior to the Effective Date shall be satisfied out of revenues attributable to the Assets after the Effective Date no matter when the activity which generated such expense occurred, subject to the allocations and Purchase Price adjustments set forth in Section 1.6. Closing shall occur on or before February 1, 2014, time being of the essence (herein the "Closing Date".)

1.5 Consents and Approval. All required consents to the transfer of the Assets to Buyer and all regulatory approval (if any) required for such transfer shall be obtained prior to the Closing Date. Buyer and Seller will cooperate in obtaining all required consents and approvals.

1.6 Allocations and Purchase Price Adjustments. The following allocations shall apply at Closing and shall be applied as adjustments to the Purchase Price as necessary:

(a) Licensing Fees. Licensing fees and license renewal fees (if any) paid by Seller prior to the Effective Date shall be prorated between Seller and Buyer as of the Effective Date based upon the remaining post-Effective Date term of the license obtained or renewed at Seller's expense. The Buyer's share of such fees shall be added to the Purchase Price.

(b) Prepaid Expenses. Expenses paid by Seller prior to October 1, 2013 relating to the operation of the Assets after the Effective Date shall be determined and the amount of such prepaid expenses shall be added to the Purchase Price.

EXHIBIT 7

(c) <u>Owner Notes Payable or Loan Accounts</u>. All payments due from Seller's owners for loans made by Seller (if any) shall be determined as of the Effective Date. Sums due to Seller by its owners attributable to the post-Effective Date period will reduce the Purchase Price and Notes or other evidence of such loans will be cancelled without recourse at Closing.

(d) <u>Deposit</u>. Any deposit or prepayment paid by Buyer to or for the benefit of Seller shall be credited to the Purchase Price if the sale is closed. In the event of termination for title failure as provided herein, Buyer's deposit or prepayment shall be refunded within ten (10) days of demand by Buyer.

(e) <u>Taxes</u>. All taxes due by Seller of any kind or nature, relating to, or which may result in a lien against, the Assets, including without limitation all employee withholding, social security and Medicare payments, shall have been paid by Seller prior to the Closing Date.

    (i) Any such taxes paid by Buyer for any pre-Closing period shall be paid first from Seller's cash and if such cash is not sufficient Buyer may deduct such tax liabilities from the Purchase Price.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLER

2.1 <u>Validity and Effect of Agreement</u>. Seller represents and warrants that this Agreement constitutes, and all agreements and documents contemplated hereby when executed and delivered pursuant hereto for value received will constitute, the valid and legally binding obligations of Seller enforceable in accordance with their terms. Seller represents and warrants that the execution and delivery of this Agreement does not and the consummation of the transaction contemplated hereby will not (i) require the consent of any person which will not be obtained at or prior to Closing or (ii) result in the breach of any term or provision of, or constitute a default under, any obligation under the MSAs,, or (iii) result in the creation or imposition of any lien, charge, pledge or security interest in the Assets or other encumbrance upon any part of the Assets pursuant to any provision of, any order, judgment, arbitration award, injunction, decree, indenture, mortgage, lease, license, lien, or other agreement or instrument to which Seller is a party or by which the Assets are bound.

2.2 <u>Title to Assets</u>. Seller represents and warrants that the Assets are owned by Seller free and clear of all liens, encumbrances, security interests, pledges, charges, assessments and adverse claims of any kind. The Assets are subject to no restrictions with respect to transferability to Buyer. Buyer acknowledges that Seller's post-closing warranties are limited, as provided in Section 1.3 herein.

2.3 <u>Accounts</u>. Annexed hereto and made a part hereof as Schedules 1 and 2 respectively are true copies of Seller's accounts payable and accounts receivable as of August 31, 2013. To the

3

EXHIBIT 7

best of Seller's owners' knowledge, after due inquiry, the accounts described in Schedules 1 and 2 are true and correct as of the date of this Agreement.

(a) If any account shown in Schedules 1 or 2 is materially different from the balance shown, or any account payable is omitted, the net adverse effect of such differences in Seller's accounts will be deducted from the Purchase Price.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

3.1 <u>Validity and Effect of Agreement</u>. Buyer represents and warrants that this Agreement constitutes, and all agreements and documents contemplated hereby when executed and delivered pursuant hereto for value received will constitute, the valid and legally binding obligations of Buyer enforceable in accordance with their terms. Buyer represents and warrants that the execution and delivery of this Agreement does not and the consummation of the transaction contemplated hereby will not (i) require the consent of any third party or (ii) result in the breach of any term or provision of, or constitute a default under, any obligation under any agreement to which Buyer is a party, or (iii) result in the creation or imposition of any lien, charge, pledge, security interest or other encumbrance upon, any part of the Assets pursuant to any provision of, any order, judgment, arbitration award, injunction, decree, indenture, mortgage, lease, license, lien, or other agreement or instrument to which Buyer is bound.

3.2 <u>Investment Representation</u>. Buyer is acquiring the Assets for its own account beneficially and not as agent for any other person or entity. Further, Buyer represents that it is acquiring the Assets for investment and not for resale.

3.3 <u>Due Diligence</u>. Buyer has had full opportunity to inspect the Assets, all information requested concerning the Assets, liabilities, MSAs, and other agreements relating to the Assets, claims, causes of action, financial reports, and all other documents or instruments and each and every fact which it deemed material or which it thought prudent to investigate, and Buyer is fully satisfied with the status of the Seller, the Assets and liabilities associated therewith and is acquiring the Assets after full disclosure; subject to, however, and in reliance upon, the accuracy of Seller's representations and warranties in this Agreement.

3.4 <u>Purchase Price Available</u>. Buyer has sufficient cash or other liquid assets available to pay the Purchase Price due hereunder without any necessity to finance any portion thereof or raise any additional capital.

3.5 <u>Sale of Buyer</u>. Buyer and Owen will use their commercially reasonable best efforts to negotiate and close a sale of Buyer or its assets, on terms and for a price those parties determine reflects the true market value of Buyer, prior to the expiration of the ten (10) year term of the Net Sales Proceeds Interest. Buyer and Owen will provide to Lowery and Brazzel information on potential sales transactions as such opportunities arise.

EXHIBIT 7

## ARTICLE IV

## ASSUMPTION OF LIABILITIES AND INDEMNIFICATION

4.1 <u>Indemnification by Seller</u>. Seller shall indemnify and hold Buyer harmless from and against any and all damage, loss, costs, expense, obligation, claim or liability, including reasonable counsel fees and reasonable expenses of investigating, defending and prosecuting any litigation suffered by Buyer as a result of any claim, liability or obligation arising from (i) the breach by Seller of any of its representations and warranties under this Agreement, (ii) the breach of, or failure to perform or satisfy, any covenant or agreement made by Seller in or under this Agreement, or (iii) the ownership and operation of the Assets prior to the Effective Date.

4.2 <u>Indemnification by Buyer</u>. Buyer shall indemnify and hold Seller harmless from and against any and all damage, loss, costs, expense, obligation, claim or liability, including reasonable counsel fees and reasonable expenses of investigating, defending and prosecuting any litigation suffered by Seller as a result of any claim, liability or obligation arising from (i) the breach by Buyer of any of Buyer's representations and warranties under this Agreement, (ii) the breach of, or failure to perform or satisfy, any covenant or agreement made by Buyer in or under this Agreement or (iii) the ownership and operation of the Assets on or after the Effective Date.

## ARTICLE V

## SPECIAL PROVISIONS

5.1 <u>Employment</u>. After the Effective Date, Seller's owners, Lowery and Brazzel, and Seller's Office Manager, Vielly Pitts, shall become employed by Buyer and shall perform duties similar to those performed by them prior to the sale, subject to the direction of Brian T. Owen, as President of Buyer. This employment shall be at will and for the following compensation:

(a) Lowery shall be paid an annual salary of $150,000.00 and Brazzel an annual salary of $150,000.00 paid in 24 equal installments on the 1st and 15th day of each calendar month, plus benefits equal to those made available to other employees of Buyer as determined by Buyer from time to time.

(b) Vielly Pitts shall be paid an annual salary of $50,000.00 paid in 24 equal installments on the 1st and 15th day of each calendar month, plus benefits equal to those made available to other employees of Buyer as determined by Buyer from time to time

5.2 <u>Protection of Confidential Information, Non-Solicitation and Non-Competition</u>. In consideration of the employment and compensation offered by Buyer pursuant to Section 5.1 (herein "Employer") and the Purchase Price paid to Seller for the Assets, Lowery and Brazzel (herein "Employees") agree to the following covenants:

5

EXHIBIT 7

(a) Each Employee acknowledges that by virtue of his position he will have access to confidential business information of Employer, including, without limitation, customer lists, business opportunities, product pricing data and marketing plans. Each Employee agrees that all such information is proprietary to Employer and agrees to refrain from any use or disclosure of such information for any purpose whatsoever, both during the term of his employment and following his termination.

(b) Each Employee agrees that for a period of twenty-four (24) months following any termination of his employment, he will refrain from direct or indirect competition with any business conducted by Employer as of the date of termination in the counties, parishes or other geographic areas described in Exhibit C annexed hereto and made a part hereof, including, without limitation, acceptance of any employment or consultant position with any business entity engaged in competition with Employer.

(c) Each Employee agrees that he shall not solicit any employee or customer of the Employer to cease being employed by or cease doing business with Employer for a period of twenty-four (24) months after any termination of his employment within the geographic areas described in Exhibit C hereto.

(d) The parties agree and stipulate that the terms of this Section 5.2 are commercially reasonable and were relied upon by Employer in entering into this Agreement. The parties stipulate further that any violation or threatened violation by either Employee of the conditions and obligations stated in this Section 5.2 will expose Employer to loss and damage for which there is no adequate or effective monetary remedy, and thus Employer shall have the right to seek injunctive relief to prevent or correct a violation of these covenants in addition to an action for damages for breach of contract or the Employee's covenants. Further, any breach by an Employee of the provisions of this Section 5.2 will result in the breaching Employee's forfeiture of the Net Sales Proceeds Interest granted to him pursuant to Section 1.2 herein, which will be cancelled for all purposes. The parties agree that the provisions of this Section 5.2 shall survive termination of this Agreement for any reason.

(e) **Each Employee acknowledges and agrees that his execution of this Agreement as the owner and manager of the Seller shall also bind him individually to the obligations set forth in this Section 5.2.**

5.3 Termination. Net Sales Proceeds Interest. If either Employee resigns or is terminated prior to the sale of Buyer but within the ten (10) year sales period the following provisions shall apply:

(a) If the Employee resigns or is terminated without cause the Exit Price of that Employee's Net Sales Proceeds Interest shall be determined and paid to the Employee as provided herein. If the Employee is terminated for willful misconduct, gross negligence, refusal to perform his duties, conviction of a felony, violation of Section 5.2, theft, dishonesty, or an act which causes material damage to the Buyer's business reputation, the

6

EXHIBIT 7

Employee shall be terminated for such reason and shall forfeit his Net Sales Proceeds Interest on account of such misconduct.

(b) The Exit Price for the departing Employee who is eligible for payment under 5.3(a) above shall be equal to ten percent (10%) of the going concern value of the Buyer on the date of termination net of all liabilities and long term debt (if any) as determined by the agreement of Buyer and the Employee or, if no agreement is reached, by appraisal using an independent, third party appraiser selected by Buyer and Employee, whose decision on value shall be final and binding on all parties.

(c) Buyer may pay the Exit Price over a five (5) year period as follows: A down payment shall be made in cash of not less than twenty percent (20%) of the Exit Price and the balance shall be evidenced by a recourse promissory note from Buyer payable in not more than four (4) equal annual installments, plus interest at the rate of four percent (4%) per annum (simple). Unless otherwise provided in this Agreement, the initial installment of the Exit Price sale shall be paid within thirty (30) days after the Employee's termination or the determination of the Exit Price, whichever is later.

## ARTICLE VI

## TERMINATION

6.1 Termination. This Agreement may be terminated by a party only in accordance with the provision of this Article VI.

6.2 Mutual Consent. This Agreement may be terminated by mutual consent, expressed in a writing signed by both parties.

6.3 By Seller. The Agreement may be terminated by Seller upon written notice to Buyer for failure to close the sale on or before the Closing Date for any reason other than a default by Seller, time being of the essence.

6.4 By Buyer. This Agreement may be terminated by Buyer upon written notice to Seller for any reason provided such termination notice is delivered prior to the Closing Date.

6.5 Effect of Termination. If this Agreement is terminated by either party as provided in 6.3 or 6.4 above, neither party shall be liable for damages to the other Party except as provided in this Section 6.5. If termination is due to Seller's breach of this Agreement Seller shall refund the installment of the Purchase Price paid to Seller prior to termination. If termination is due to breach or failure to close by Buyer, the Seller shall retain Buyer's initial payment of the Purchase Price as liquidated damages for Buyer's failure to close the sale; provided, that in such event Buyer shall have no other liability to Seller for payment of the Purchase Price or damages arising from Buyer's failure to close.

6.6 Specific Performance. The Buyer shall have the right to demand specific

EXHIBIT 7

performance of the Seller's obligation to sell the Assets, provided Buyer is not in default of any of the Buyer's obligations or warranties hereunder. The foregoing provisions notwithstanding, Seller shall have no obligation to sell the Assets to Buyer after the Closing Date unless the failure to close the sale by that date is due exclusively to Seller's breach of this Agreement.

## ARTICLE VII

## MISCELLANEOUS

7.1 Entirety; Waiver. This Agreement and the Agreement for Access embody the entire agreement between the parties and there have been and are no agreements, representations, or warranties between the parties other than those set forth herein or those contemplated hereby. The terms of this Agreement cannot be changed, modified, released or discharged orally. No delay or failure on the part of any party in exercising any rights hereunder, and no partial or single exercise thereof, will constitute a waiver of such rights or any other rights hereunder.

7.2 Counterparts. Any number of counterparts of this Agreement may be executed and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one instrument. All such counterparts shall be deemed executed in Caddo Parish, Louisiana, for purposes of establishing venue for the resolution of any dispute.

7.3 Notice. All communication or notices required or permitted to be given under this Agreement shall be in writing, and any communication or notice shall be deemed to have been duly made if actually delivered, including delivery by facsimile transmission, receipt of which has been duly acknowledged, or if mailed by registered or certified mail, postage prepaid, and addressed to:

Seller:   Drill Pro Consulting, LLC
          1000 Chinaberry Road, Suite 303
          Bossier City, Louisiana 71111
          Attn: Kenneth Lowery and Jason Brazzel
          Fax No.: 318-658-9975

Buyer:    RWDY, Inc.
          908 Town & Country Boulevard, Suite 120
          Houston, Texas 77024
          Attn: Brian T. Owen, President
          Fax No.: 281-749-8168

A party may, by written notice delivered to the other party, change the address to which communications or written notices shall be made under this Agreement.

7.4 Captions. The table of contents and captions contained in this Agreement are solely for convenience of reference and shall not be deemed to affect the meaning or interpretation of any Article or Section hereof.

7.5 Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the successors and assigns of the parties hereto but shall not be

EXHIBIT 7

assignable by any party without the consent of the other party, which may be denied in the other party's discretion. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give any person other than the parties hereto, their successors or assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision hereof.

7.6 Severability. If any term, provisions, covenant, or restriction of this Agreement is held by any court of competent jurisdiction to be void, invalid or unenforceable, the remainder of the terms, provisions, covenants, and restrictions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. It is hereby stipulated and declared to be the intention of the parties hereto that they would have executed the remaining terms, provisions, covenants, and restrictions without including any of such which may be hereafter declared void, invalid or unenforceable.

7.7 Law and Jurisdiction. This Agreement shall be construed by and enforced under and in accordance with, and shall be governed by, the laws of the State of Louisiana. The parties consent to personal jurisdiction in the First Judicial District Court in and for Caddo Parish, Louisiana, and agree that venue for the resolution of any dispute hereunder shall lie solely within said court.

7.8 Further Assurance. The parties shall execute and deliver such additional documents and shall cause such additional action to be taken before, on, and after the Closing Date, as may be required or, in the reasonable judgment of any party, necessary or desirable, to effect or evidence the provisions of this Agreement and the transactions contemplated hereby.

7.9 Nature and Survival of Representations. All warranties, representations and agreements made in this Agreement, unless otherwise specifically provided herein, shall be deemed to be material, to have been relied upon by Buyer or Seller, as the case may be, and shall be deemed to fully survive the Closing.

7.10 Time. Time is of the essence of this Agreement and of each obligation required to be performed hereunder.

7.11 Costs. Each party shall pay their own costs, including attorneys' fees, incurred in the negotiation, execution and Closing of this Agreement; provided, that in the event of a claim of breach or other dispute arising under this Agreement the prevailing party in such dispute shall be entitled to recover from the losing party or parties the prevailing party's costs incurred in the dispute including, without limitation, reasonable attorneys' fees.

7.12 Co-Obligor. By his execution of this Agreement, Owen binds himself personally and *in solido* with Buyer for Buyer's obligation to pay the deferred Purchase Price installments due on January 15, 2015, July 15, 2015, January 15, 2016 and July 15, 2016, subject to any adjustment to those installments due Buyer under this Agreement.

[SIGNATURES ON NEXT PAGE]

EXHIBIT 7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SELLER:

DRILL PRO CONSULTING, LLC

By: _____
Kenneth Lowery, Individually and as Manager of Seller

By: _____
Jason Brazzel, Individually and as Manager of Seller

BUYER:

RWDY, Inc.

By: _____
Brian T. Owen, President

_____
Brian T. Owen, Individually for Purposes of Section 7.12 Only

10

EXHIBIT 7

## Acknowledgement

STATE OF LOUISIANA §

PARISH OF CADDO §

BEFORE ME, the undersigned authority, on this day personally appeared Kenneth Lowery and Jason Brazzel, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they are the Managers of Drill Pro Consulting, LLC, a Louisiana limited liability company, that they are duly authorized to execute the foregoing instrument, and that they executed the instrument for said Company for the purposes and consideration therein expressed, in their representative capacity, and in their individual capacity, as the Company's and the individuals free act and deed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS 26th day of September, 2013.

_____
Notary Public
In and for Caddo Parish, Louisiana
Name: _____
Number: _____
(SEAL)

RANDALL C. DAVIDSON, NOTARY PUBLIC
LA BAR ROLL NO. 1718
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE

11

EXHIBIT 7

## Acknowledgement

STATE OF LOUISIANA §

PARISH OF CADDO §

BEFORE ME, the undersigned authority, on this day personally appeared Brian T. Owen, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he is the President of RWDY, Inc., a Texas corporation, that he is duly authorized to execute the foregoing instrument, and that he executed the instrument for said Company for the purposes and consideration therein expressed, in his representative capacity, and in his individual capacity, as the Company's free act and deed and as his individual act on the limited basis indicated in said instrument.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS 26th day of September, 2013.

_____
Notary Public
In and for Caddo Parish, Louisiana
Name: _____
Number: _____

(SEAL)
RANDALL S. DAVIDSON, NOTARY PUBLIC
LA. BAR ROLL NO. 4716
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE

12

EXHIBIT 7

# EXHIBIT "A"

# TO PURCHASE AND SALE AGREEMENT

# (TO BE ATTACHED TO FINAL)

Part 1:    Master Service Agreements (See attached)

Part 2:    Equipment and Vehicles

              [Attach inventory or depreciation schedule of tangible assets]

Part 3:    Real Estate

              [Attach list of all real estate being sold if any]

Part 4:    Other Assets

              [Include here if an Asset is not covered above]

1

EXHIBIT 7

## EXHIBIT "A"

## TO PURCHASE AND SALE AGREEMENT

Part 1: Master Service Agreements

AIX Energy, Inc.
Amerril Energy, LLC
Anadarko Petroleum Corporation
Arklatex Energy
BHP Billiton Petroleum
Caruthers Producing Company
Cypress Operating LLC
FIML Natural Resources
Fasken Oil and Ranch, Ltd.
Gulfport Energy Corp
Halcon Operating Company
Hunt Oil Company
Memorial Resource Development
Midstates Petroleum
Penn Virginia Corporation
Petro-Chem Operating Co, Inc.
Sklar Exploration
Stonegate Production Company LLC
Ursa Operating Company LLC
Whiting Oil and Gas Corp

ALL MSA's ARE TO BE TURNED OVER TO RWDY AS SOON AS POSSIBLE WITH THE UNDERSTANDING THAT WE MAY NOT BE ABLE TO GET THEM CONVERTED UNTIL 2014.

1

EXHIBIT 7

# EXHIBIT "B"

# TO PURCHASE AND SALE AGREEMENT

# (ASSIGNMENT AND BILL OF SALE TO BE ATTACHED)

1

EXHIBIT 7

# EXHIBIT "C"

# TO PURCHASE AND SALE AGREEMENT

# NON-COMPETE AREA

The obligations of Lowery and Brazzel under Section 5.2 (b) and (c) shall be effective in the following counties, parishes or municipalities:

[TO BE ADDED]

1

EXHIBIT 7

# SCHEDULE 1

## TO PURCHASE AND SALE AGREEMENT

## SELLER'S ACCOUNTS PAYABLE

[TO BE ADDED]

1

EXHIBIT 7

# SCHEDULE 2

# TO PURCHASE AND SALE AGREEMENT

# SELLER'S ACCOUNTS RECEIVABLE

[TO BE ADDED]